2001 ME 80

**STATE of Maine**

v.

**Gary BARNARD.**

Supreme Judicial Court of Maine.

Submitted on briefs April 2, 2001.
Decided May 11, 2001.

**854**

G. Steven Rowe, Attorney General, James M. Cameron, Asst. Attorney General, Matthew Erickson, Asst. Attorney General, Augusta, for State.

Jeffrey C. Toothaker, Esq., Toothaker & Chong, Ellsworth, for defendant.

Panel: WATHEN, C.J., and CLIFFORD, RUDMAN, DANA, SAUFLEY, ALEXANDER, and CALKINS, JJ.

CLIFFORD, J.

[¶ 1] Pursuant to 15 M.R.S.A. § 2115–A(2) (1980 & Supp.2000), the State appeals from a judgment of acquittal entered in the Superior Court (Washington County, *Studstrup, J.*) in favor of the defendant, Gary Barnard, following a trial at which a jury found Barnard guilty of drug trafficking (Class B). 17–A M.R.S.A. § 1103 (Supp.2000).[1] The State contends that there was ample evidence on which the jury could conclude beyond a reasonable doubt that Barnard was in illegal possession of a scheduled drug, and, accordingly, that the court erred in entering the judgment of acquittal. We agree and vacate the judgment.

[¶ 2] The facts are not in dispute. Barnard was identified as the seller of two tablets following a controlled purchase of drugs arranged by the Maine Drug Enforcement Agency (MDEA). Two MDEA agents prepared Robert Barter for the controlled undercover purchase, and took him to a residence where it was expected that drugs would be available for purchase. Barter entered the residence and returned with two tablets he purchased from Barnard for seventy-five dollars. Barnard was subsequently charged with unlawful trafficking of a schedule W drug, Hydromorphone, also known as Dilaudid, a violation of 17–A M.R.S.A. § 1103(1).[2]

[¶ 3] At Barnard's trial, the State produced, pursuant to 17–A M .R.S.A. § 1112(1),[3] a certificate of analysis of the

---

1. M.R.Crim. P. 29(b) provides that "[i]f the jury returns a verdict of guilty, ... a motion for judgment of acquittal may be made.... If a verdict of guilty is returned the court may on such motion set aside the verdict and enter judgment of acquittal." M.R.Crim. P. 29(b).

2. The statute reads: A "person is guilty of unlawful trafficking in a scheduled drug if the

person intentionally or knowingly traffics in what the person knows or believes to be a scheduled drug and that is in fact a scheduled drug ..." 17–A M.R.S.A. § 1103(1) (Supp. 2000).

3. Title 17–A M.R.S.A. § 1112(1) provides:

tablets. The certificate indicated that a certified chemist had examined the tablets and determined that they were Dilaudid based on their appearance. The chemist, however, did not perform a chemical analysis of the tablets. The court refused to admit the certificate in evidence or allow it to be considered by the jury. The court concluded that 17–A M.R.S.A. § 1112 requires the laboratory issuing the certificate to perform an analysis on the drug in order for the certificate to be admissible and to be given prima facie evidence status as to the composition of the drug.

[¶ 4] Barter testified during the trial that Dilaudid pills are heart-shaped and white, and he described the tablets he purchased from Barnard as "heart-shaped, white pill[s] with an 8 on the back and two little circles on front."[4] He also testified that, during the transaction with Barnard, the pills were referred to as "D's." The State also presented testimony from the MDEA agents who monitored the controlled purchase of the tablets by Barter from Barnard. One agent, who received the tablets from Barter and who had ten years of experience as a drug agent, testified that the tablets were identical in appearance to the Dilaudid he had seized in other cases. He described Dilaudid as a white pill, round, triangular or heart shaped, and stamped with an "8," and said that the tablets he received from Barter were heart-shaped, white pills with an "8" stamped on them. Another MDEA agent involved with the undercover operation testified to his experience with Dilaudid and his knowledge that the Dilaudid pills are shaped like a heart with a symbol on the back.

[¶ 5] Responding to Barnard's objection, the court prohibited the agents from stating in opinion form the identity of the tablets.[5] The court did, however, allow each agent to testify:

as to what he saw and based upon his training what it appeared to be [and would] not allow him to testify [w]hat it is or was because there is no foundation for that. He is not a chemist. He did not do a chemical analysis, and I think it then becomes a question of argument to the jury whether looks like is sufficient without the analysis.

The court further allowed witness testimony:

as to how they appeared to him, not even what they appeared to be necessarily, but he can testify as to his training and experience as to what Dilaudid looks like.... Then it becomes, I think, a question of argument to the jury as to whether that is sufficient; and I'll have to think about whether this even survives a motion for acquittal....

The court also agreed with Barnard's contention that the MDEA agents were not experts on the chemical analysis of the tablets.

[¶ 6] At the close of the State's case-in-chief, Barnard moved for a judgment of

---

A laboratory which receives a drug or substance from a law enforcement officer or agency for analysis as a scheduled drug shall ... analyze the same as requested, and shall issue a certificate stating the results of the analysis. Such certificate ... shall be prima facie evidence that the composition, quality and quantity of the drug or substance are as stated therein ....

17–A M.R.S.A. § 1112(1) (1983).

4. Barter had prior convictions and admitted to using Dilaudid pills in the past without a prescription.

5. One agent, however, testified that Barter handed him "the Dilaudid, the two pills, and we went back ...." This testimony came after the court set the parameters of acceptable testimony, but no objection was made that the witness called and essentially identified the tablets as Dilaudid.

acquittal. *See* M.R.Crim. P. 29(b). The court denied the motion, concluding that a chemical analysis was not a prerequisite to presenting the issue to the jury. At the close of all the evidence, Barnard renewed his motion for a judgment of acquittal. The court took the motion under advisement and reserved its ruling until after the case had been submitted to the jury.

[¶ 7] The jury returned a guilty verdict against Barnard, and Barnard again renewed his motion for a judgment of acquittal. The court concluded that the State failed to prove beyond a reasonable doubt that the drug was a scheduled drug "absent some testimony as to the chemical composition, quantity, quality of the two tablets,"[6] and subsequently granted Barnard's motion and entered a judgment of acquittal. The State then filed this appeal. *See* 15 M.R.S.A. § 2115–A(2) (1980 & Supp.2000).[7]

## I.

[¶ 8] In defending the judgment of acquittal, Barnard contends that the State must produce a chemical analysis in order to prove the composition of a drug and to sustain a drug conviction. We disagree.[8] There may be valid reasons why a drug is not subjected to a chemical analysis. For example, a substance may not always be available to analyze or may be the type that is "consumed within a comparatively short time." *U.S. v. Walters,* 904 F.2d 765, 770 (1st Cir.1990). Therefore, we decline to adopt a bright line rule requiring a chemical analysis in order to prove in every criminal case that a substance is in fact a scheduled drug.

## II.

[¶ 9] The State contends that there was ample competent evidence in this case on which to base a conclusion that the tablets sold by Barnard were Dilaudid. To convict Barnard of trafficking, the State was required to prove that the tablets were in fact a scheduled drug, an essential element of the crime charged and the only element in this case that is in dispute. 17–A M.R.S.A. § 1103(1) (Supp. 2000). The principal source of the proof is

6. The court noted that it was not saying that a chemical analysis is absolutely required for any conviction under 17–A M.R.S.A. § 1103, but rather that the State did not produce sufficient evidence in this case.

7. Maine statutory law allows the State to appeal a decision from the Superior Court to the Law Court "after trial and after a finding of guilty by a jury or the court from ... orders resulting in termination of the prosecution in favor of the accused." 15 M.R.S.A. § 2115–A (2) (1980 & Supp.2000). The State's appeal from a judgment of acquittal entered following a guilty verdict is contemplated by the statute. *State v. Spooner,* 666 A.2d 863, 864 n. 1 (Me.1995); *see also State v. Howes,* 432 A.2d 419, 422–24 (Me.1981). Barnard's suggestion that the appeal is untimely is incorrect, as the time to file an appeal begins to toll once the judgment is entered on the docket.

8. We do agree with the trial court, however, that a certificate of analysis performed pursuant to section 1112(1) requires an actual chemical analysis in order to be admitted as prima facie evidence of the chemical composition of a substance. Title 17–A M.R.S.A. section 1112(1) creates a statutory exception to the hearsay rule for a sworn chemist's certificate that establishes the content of substances submitted to qualified laboratories for analysis, and it allows the prosecution to admit as prima facie evidence a certificate that is a "sworn representation by a laboratory chemist ... that a properly performed test showed a substance to be a particular scheduled drug." *State v. Christianson,* 404 A.2d 999, 1003 (Me.1979); *State v. Bishop,* 392 A.2d 20, 25 (Me.1978) (emphasizing beneficent purpose to avoid needless waste of chemist's time and effort). The court correctly denied admission of the certificate as prima facie proof of the chemical content of the tablets.

the testimony of the witnesses who recounted the nature of the purchase and gave descriptions of the tablets.

[¶ 10] The State had the burden to prove to the jury beyond a reasonable doubt that the tablets were Dilaudid. *See State v. Clarke*, 1999 ME 141, ¶ 12, 738 A.2d 1233, 1235; *State v. Lavigne*, 588 A.2d 741, 744 (Me.1991); *State v. Dupray*, 448 A.2d 328, 328–29 (Me.1982). We review the entry of a judgment of acquittal following trial and a jury's finding of guilt to determine whether, viewing the evidence as a whole in a light most favorable to the State, a jury could rationally find beyond a reasonable doubt every element of the offense charged. *State v. Marden*, 673 A.2d 1304, 1311 (Me.1996); *State v. Spooner*, 666 A.2d 863, 864–65 (Me.1995) (giving deference to findings of jury acting on competent evidence).

[¶ 11] A conviction may be based on circumstantial evidence, even if inferences made from such evidence "are contradicted by parts of the direct evidence." *State v. Stinson*, 2000 ME 87, ¶ 8, 751 A.2d 1011, 1014; *Marden*, 673 A.2d at 1312 (allowing fact finder to draw reasonable inferences from circumstantial evidence that victim put in fear without direct evidence of victim's fear); *Lavigne*, 588 A.2d at 743–44 (finding ample evidence to support conviction based on drugs, drug ledgers and paraphernalia found in home, and witness testimony about previous drug transactions); *see also State v. Deering*, 611 A.2d 972, 975 (Me.1992) (declaring evidence that

defendant negotiated terms of sale for drugs, procured drugs, delivered them, and accepted payment sufficient to convict); *State v. Ross*, 591 A.2d 1308, 1310 (Me.1991) (affirming conviction based on testimony of officer observing defendant even though only circumstantial evidence as to seller's identify).

[¶ 12] In the absence of a chemical analysis, other direct and circumstantial evidence can establish beyond a reasonable doubt the identity of drugs. That evidence can include the testimony of a witness who has experience based on familiarity with the drugs through law enforcement, prior use, or trading. *U.S. v. Walters*, 904 F.2d 765, 770–71 (1st Cir. 1990) (relying on witness present at cocaine sale who had used cocaine); *U.S. v. Harrell*, 737 F.2d 971, 978 (11th Cir.1984), *cert. denied*, 469 U.S. 1164, 105 S.Ct. 923, 83 L.Ed.2d 935 (1985) (admitting identification of illicit nature of suspected substance based on past use coupled with present observation of substance at issue). Evidence of the nature and circumstances of the sale are also relevant to the identity of the drug and to whether it is an illegal substance. *U.S. v. DiMarzo*, 80 F.3d 656, 661 (1st Cir.1996) (referencing automobile with secret compartments filled with cocaine bricks and meeting plans); *Harrell*, 737 F.2d at 978 (suggesting on-scene remarks identifying substance as drug as example of evidence); *Deering*, 611 A.2d at 975.[9]

9. The identity of a drug can be proved by evidence in the form of opinion testimony if presented by someone who identifies the substance and who is sufficiently experienced with the drug. *See Copeland v. State*, 430 N.E.2d 393, 396 (Ind.Ct.App.1982) (requiring evidence establishing distinguishable characteristics of Dilaudid and more than visual identification). Identification of a substance as a drug may under certain circumstances be

based solely on the opinion of a knowledgeable lay person, especially where the substance may be consumed within a short time. *Walters*, 904 F.2d at 770. Because the jury found the evidence sufficient to convict Barnard without the opinion testimony that was proffered by the State and that the court excluded, we do not reach the State's argument that the court erred in excluding the opinions of the MDEA agents.

[¶ 13] "The weight to be given to the evidence and the determination of witness credibility are the exclusive province of the jury." *Marden,* 673 A.2d at 1312. Proof beyond a reasonable doubt may rest upon the testimony of a single witness. *State v. Bonney,* 351 A.2d 107, 110 (Me.1976).

[¶ 14] In this case, the agents and the person who made the buy testified to the nature and the circumstances of the sale, and testified in some detail as to the appearance of Dilaudid and the appearance of the tablets. It was left to the jury to determine the weight to be given that testimony based on the knowledge, competence, training and experience of those witnesses. *See State v. Pierce,* 2001 ME 14, ¶ 23, 770 A.2d 630 (allowing circumstantial evidence that defendant furnished liquor to minor).

[¶ 15] The MDEA witnesses were experienced agents familiar with drugs and with the appearance of Dilaudid in particular. Barter was a past user of the drug. Coupled with their testimony as to the nature of the sale, and as to the shape, size, and markings of the tablets purchased from Barnard, and the reference to the street name of the drug during the transaction; the evidence was sufficient to support the conclusion of the jury beyond a reasonable doubt that the tablets were Dilaudid.

The entry is:

Judgment vacated and remanded to the Superior Court for the entry of a judgment of conviction.